# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OBAID ULLAH, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, <br><br> Defendant. | Civil Action No. 18-2785 (JEB) |

## MEMORANDUM OPINION

This case, like many brought under the Freedom of Information Act, triggers a clash between personal and public concerns, between a family's interest in mourning one of its own and the Government's interest in protecting sensitive national-security information. In 2002, Afghan citizen Gul Rahman died in an overseas detention center at the hands of the Central Intelligence Agency. Almost two decades later, the whereabouts of his corpse remains unknown. Plaintiffs Obaid Ullah — the representative of Rahman's estate — and the American Civil Liberties Union now seek this Court's enforcement of their FOIA request for information about what happened after his death.

Although the Government has produced a fair number of documents detailing its treatment of Rahman, it has withheld others, relying heavily on FOIA exemptions that protect classified information from disclosure. While mindful that "[f]amily members have a personal stake in honoring and mourning their dead," Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 168 (2004), the Court finds that the Government has carried its burden of demonstrating the propriety of the relevant exemptions. It will therefore grant Defendant's Motion for Summary Judgment.

1

**I.     Background**

   A. <u>Factual Background</u>

As noted above, this FOIA case arises out of Rahman's death in 2002. When Rahman, who was allegedly residing in a Refugee Camp in Peshawar, Pakistan, traveled to Islamabad for a medical appointment, the CIA took custody of him and transported him to a facility in an unknown location. <u>See</u> ECF No. 1 (Complaint), ¶ 2. According to Plaintiffs, the CIA then "forcibly disappeared Mr. Rahman and tortured him to death." <u>Id.</u>, ¶ 1.

The Agency has confirmed that Rahman died in its custody, releasing various reports that provide detailed information about his detention, treatment, and death. These materials, comprising hundreds of pages (albeit in redacted form), memorialize that Rahman died of hypothermia after being short-chained to a concrete floor in near-freezing temperatures. <u>See</u> Office of CIA Inspector General, <u>Report of Investigation: Death of Detainee</u> (April 27, 2005) at 3; Memorandum from John Brennan, CIA Director, to Sens. Feinstein & Chambliss, <u>CIA Comments on the Senate Select Committee on Intelligence Report on the Rendition, Detention, and Interrogation Program</u> 4, 9 (June 27, 2013). As of this date, the CIA has not officially informed Rahman's family of his death or returned his body to them. <u>See</u> Compl., ¶ 7.

   B. <u>Procedural History</u>

Seeking primarily to discover the location of Rahman's remains, Plaintiffs filed a FOIA request on April 18, 2018, for records concerning:

> (1) The United States' (or its agents') disposition of Mr. Rahman's body after his death in CIA custody in November 2002;
>
> (2) Any and all documents referencing the location of Mr. Rahman's body; and

> (3) Procedures, protocols, or guidelines to be followed in the event of a CIA detainee's death while in United States' custody, including family notification, investigation and disposition of the body.

ECF No. 17-3 (Declaration of Antoinette B. Shiner), ¶ 6. After the CIA failed to immediately respond, Plaintiffs brought this suit in November 2018. See ECF No. 18 (Pl. Opp.) at 2.

On May 31, 2019, the CIA identified 38 responsive documents, producing 9 of those documents in part while withholding the remaining 29 in full. See ECF No. 17-2 (Def. Statement of Facts), ¶ 4. (The CIA later determined that three of the documents withheld in full were not responsive. Id.) Defendant justified its withholdings by invoking FOIA Exemptions 1 (information classified to protect national security), 3 (information the disclosure of which is prohibited by another federal law), 5 (privileged communications), 6 (information that invades another individual's personal privacy), and 7(C) and (D) (information that was compiled for law-enforcement purposes and threatens to disclose personal information or the identity of a confidential source). See 5 U.S.C. § 552(b). The CIA acknowledges that the produced documents in their current redacted forms do not reveal the disposition or location of Rahman's body or any official policy the Agency has adopted with regard to the disposal of bodies. Frustrated in their pursuit of this specific information, Plaintiffs then informed Defendant of their intent to challenge the asserted withholdings. See ECF No. 15 (Joint Status Report of June 14, 2019) at 1.

The CIA countered with a Motion for Summary Judgment, contending that the agency had fulfilled its search obligations under FOIA and that any withholdings were justified by the above-mentioned exemptions. Plaintiffs opposed that Motion, challenging the CIA's withholdings and its assertion that none of the redacted information was segregable. The Court

refrained from immediately deciding the Motion, instead ordering the Government to produce the contested documents for *in camera* review. It has since reviewed the redactions along with Defendant's various justifications. Armed with the parties' submissions and aided by its own independent analysis of the documents, the Court is ready to rule.

## II. Legal Standard

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the Court is to construe that evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Brayton v. Office of the U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011) (same). In these cases, the agency bears the ultimate burden of proof to demonstrate the adequacy of its search and that it properly withheld any records. See Defs. of Wildlife, 623 F. Supp. 2d at 88, 91; see also Morley v. CIA, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (same). The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."

Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

### III. Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." U.S. Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (internal quotation marks omitted). The Act promotes these aims by providing that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . .[,] shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). Nine categories of information are exempt from FOIA's broad disclosure mandate, see 5 U.S.C. § 552(b), but the agency bears the burden of justifying any withholdings. See Defs. of Wildlife, 623 F. Supp. 2d at 88. "While those exemptions must be narrowly construed, they still must be given meaningful reach and application." DiBacco v. U.S. Dep't of Army, 795 F.3d 178, 183 (D.C. Cir. 2015) (internal quotation marks and citations omitted). The Act thereby establishes a "workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (quotation marks omitted).

In assessing whether the Government has carried its burden of establishing that a given exemption applies, the Court is guided by a veritable avalanche of FOIA-related precedent. It is well established that "[t]o show that unproduced documents are exempt from FOIA, an agency

5

may file 'affidavits describing the material withheld and the manner in which it falls within the exemption claimed.'" Bin Ali Jaber v. U.S. Dep't of Def., 293 F. Supp. 3d 218, 224 (D.D.C. 2018) (quoting King v. DOJ, 830 F.2d 210, 217 (D.C. Cir. 1987)). Ultimately, "when an agency seeks to withhold information, it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant." Morley, 508 F.3d at 1122 (quoting King, 830 F.2d at 219). Agencies often fulfill this obligation by filing "a so-called 'Vaughn Index,'" which catalogs each withholding and provides the relevant justification. See Defs. of Wildlife, 623 F. Supp. 2d at 88. "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" Larson v. U.S. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007)).

As an initial matter, the Court pauses to note the narrow range of the existing dispute between the parties. Plaintiffs do not contest the adequacy of the CIA's search itself or its withholdings under FOIA Exemptions 6, 7(C), and 7(D). See Pl. Opp. at 3 n.1. While they ostensibly challenge the Agency's withholdings under Exemptions 1, 3, and 5, the CIA has not justified any withholdings exclusively under Exemption 5. Instead, all documents and portions of documents for which the Agency has claimed Exemption 5 are also covered by Exemptions 1 or 3 (and generally both).

This overlap among the claimed exemptions makes the Court's role substantially less complicated. Because "the Government may withhold documents or portions thereof as long as [one] privilege applies," Cause of Action Inst. v. DOJ, 330 F. Supp. 3d 336, 351–52 (D.D.C. 2018), the Court "need not address the other exemptions invoked" for any particular withholding justified by a single exemption. See Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 925 (D.C. Cir. 2003). The Court therefore will consider only whether the CIA has properly justified its

6

claimed withholdings under Exemptions 1 and 3, as well as whether it has satisfied its burden of demonstrating that no additional information is segregable and thus can be released.

  A. Exemption 1

FOIA Exemption 1 protects classified information. To be precise, it shields from disclosure matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The Government argues that the redacted information sought by Plaintiffs was properly classified under Executive Order 13,526, which "prescribes a uniform system for classifying, safeguarding, and declassifying national security information." Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009). The Order provides that "information may be originally classified" if four conditions are met:

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United Stated Government;
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security. . .[,] and the original classification authority is able to identify or describe the damage.

Id. § 1.1(a). Section 1.4, in turn, identifies eight categories of information that may potentially be subject to classification; among them are "intelligence activities (including covert action) [or] intelligence sources or methods," and "foreign relations or foreign activities of the United States, including confidential sources." Id. § 1.4(c)–(d).

Generally, an agency invoking Exemption 1 must make both a procedural and substantive showing — namely, that it both "complies with classification procedures established by the relevant executive order and withholds only such material as conforms to the order's substantive criteria for classification." Mobley v. DOJ, 870 F. Supp. 2d 61, 66 (D.D.C. 2012) (quoting King, 830 F.2d at 214. In this case, however, Plaintiffs challenge only the CIA's substantive showing. In particular, they principally question whether the release of the withheld information "could be expected to cause exceptionally grave damage to national security." ECF No. 18-1 (Pl. Statement of Genuine Issues), ¶ 13.

To support its invocation of Exemption 1, the CIA relies on the declaration of Antoinette Shiner, the Information Review Officer for its Litigation Information Review Office. In this role, Shiner is "responsible for the classification review of CIA documents and information that may be the subject of . . . public requests for information under [FOIA]." Shiner Decl., ¶ 3. Of relevance here, she is "authorized to assess the current, proper classification of CIA information, up to and including TOP SECRET information, based on the classification criteria of Executive Order 13526 and applicable regulations." Id., ¶ 2. Shiner asserts that the disputed withholdings are correctly classified under E.O. 13526 because they consist of "details about foreign liaison services; locations of covert CIA installations and former detention centers located abroad; and descriptions of specific intelligence methods and activities." Id., ¶ 16.

In as much detail as she deems possible, Shiner explains why the disclosure of the information sought by Plaintiffs would harm national-security interests. With regard to the withheld "Foreign Liaison and Government Information," she notes that this includes "the content of . . . communications with foreign government officials" as well as "the existence of the U.S. Government's relationships with particular intelligence services and foreign government

8

officials," the disclosure of which could "damage the relations with the entities mentioned[,] . . . harming intelligence sharing." Id., ¶ 17. Second, as to "Field Installations," she points out that the "[o]fficial acknowledgment that the CIA has or had a facility in a particular location abroad could cause the government of the country in which the installation is or was located to take countermeasures . . . to eliminate the CIA's presence within its borders or curtail cooperation with the CIA," "could result in terrorists and foreign intelligence services targeting that installation," or "could harm relationships with foreign countries that housed those installations." Id., ¶ 18. Finally, as to "Intelligence Methods and Activities," she avers that "the documents also contain details that would disclose other intelligence methods and activities of the CIA." Id., ¶ 19. These activities are "highly sensitive," and their disclosure "could impair the effectiveness of CIA's intelligence collection." Id.

Plaintiffs characterize the Shiner Declaration as disingenuous and vague. They argue that the affidavit offers only "abstract and conclusory statements" connecting the information sought with classified information. See Pl. Opp. at 15. Plaintiffs also claim that innocent details such as the "dates" of Rahman's detention cannot possibly be legitimately classified as national-security information. Id. at 14. They posit, moreover, "[I]t is no secret that CIA operated on bases throughout Afghanistan or that its personnel interrogated prisoners in Afghanistan in 2002 and 2003." Id. at 15.

The Court disagrees, finding that the Government has satisfied its burden of showing that the withheld information is properly classified under E.O. 13526's substantive criteria. As a threshold matter, this Circuit's FOIA caselaw cautions strongly against second-guessing the Government's discretionary decisions in matters of national security. Instead, courts "accord substantial weight to an agency's affidavit concerning the details of the classified status of the

disputed record because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse effects might occur as a result of a particular classified record." Larson, 565 F.3d at 864 (quoting Ctr. for Nat'l Sec. Studies, 331 F.3d at 927). For this reason, courts have consistently rejected attacks on the Government's invocation of Exemption 1 when faced with substantially similar affidavits and contested records as those at issue here. See, e.g., DiBacco v. U.S. Dep't of Army, 234 F. Supp. 3d 255, 270 (D.D.C. 2017), aff'd., 926 F.3d 827 (D.C. Cir. 2019) (reaching similar conclusion based on similar justification provided by Government); Am. Civil Liberties Union v. U.S. Dep't of Def., 628 F.3d 612, 624–25 (D.C. Cir. 2011) (same).

This is not to suggest that Exemption 1 embodies an anti-disclosure talisman that the Government can wield whenever it so desires. Instead, the Court bases its conclusion on a variety of specific factors beyond the sensitive nature of the records at issue: the explanation provided by Shiner, the context supplied by the unredacted records, and the Court's own *in camera* review of the Government's withholdings. All told, the CIA's "logical" assessment is not "called into question by contradictory evidence in the record or by evidence of agency bad faith." Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980).

First, contrary to Plaintiffs' contention, Shiner's declaration is not excessively abstract or vague given the context. She instead offers a "logical connection" between disclosure of the redacted information and potential consequent harm to national security. See Rosenberg v. U.S. Dep't of Def., 342 F. Supp. 3d 62, 86 (D.D.C. 2018). She identifies both the type of information withheld (such as facility locations and cooperating foreign partners) and the reasons why the information remains classified (such as to protect ongoing CIA operations and foreign partners).

10

While Plaintiffs refuse to believe that the redacted information is actually "secret," or even significant, Shiner attests to the contrary. As to the issue of dates specifically, for example, she notes that the CIA "routinely protects . . . seemingly innocuous details" such as "dates associated with a particular program," id., ¶ 20, and "undisclosed details about the practice of intelligence gathering and Agency tradecraft, which continue to have application to other types of CIA operations and activities." Id., ¶ 21. While a FOIA plaintiff may compel disclosure of information if the government has already "officially acknowledged" that information, "[p]rior disclosure of similar information does not suffice; instead, the <u>specific</u> information sought by the plaintiff must already be in the public domain by official disclosure." <u>Am. Civil Liberties Union</u>, 628 F.3d at 621 (quoting <u>Wolf</u>, 473 F.3d at 378). "The insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'" <u>Wolf</u>, 473 F.3d at 378 (quoting <u>Public Citizen v. U.S. Dep't of State</u>, 11 F.3d 198, 202 (D.C. Cir. 1993)). Plaintiffs' argument that the withheld information has already been disclosed because it is known that the CIA operated <u>generally</u> throughout Afghanistan in 2002 therefore misses the point entirely. Indeed, the year 2002 is not even redacted from the produced documents. <u>See, e.g.</u>, IG Report at 2 ("The cable from [redacted] on [redacted] November 2002 reporting that Rahman had admitted his identity stated, 'Rahman spent the days since his last session . . . in cold conditions with minimal food and sleep.'"). Instead, <u>specific</u> dates and locations appear to be redacted — a conclusion confirmed by this Court's *in camera* review.

Additionally, even if Plaintiffs are correct that some of the redacted information has already entered into the public domain, this Court has previously embraced "the intuitive proposition that official disclosure of information already in the public realm can nevertheless affect national security." <u>Cable News Network, Inc. v. FBI</u>, 384 F. Supp. 3d 19, 37 (D.D.C.

11

2019); see also Edmonds v. FBI, 272 F. Supp. 2d 35, 49 (D.D.C. 2003) ("[I]n the area of national security, it is accepted that an agency can determine that disclosure of information already in the public realm 'reasonably could be expected to cause damage to the national security.'") (quoting Washington Post v. U.S. Dep't of Def., 766 F. Supp. 1, 10 (D.D.C. 1991)). The "mere fact" that some similar information about CIA operations may be in the public domain does not "eliminate the possibility that further disclosures cause harm." Cable News Network, 384 F. Supp. at 37 (quoting Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990)).

At this juncture, it bears mention that the CIA is hardly stonewalling regarding its role in Rahman's death. It has produced no small amount of information — both prior to and during this litigation — regarding his demise. The Inspector General Report, for example, contains 64 pages of material divulging numerous details surrounding his captivity and death. See, e.g., IG Report at 2 ("Rahman was subjected to sleep deprivation sessions of up to 48 hours, at least one cold shower, and a 'hard takedown' termed 'rough treatment' as reported in pre-death cables addressing the progress of the interrogation."); see also id. at 3 (describing events on a redacted day in November 2002 and providing details about how Rahman threatened his guarads was subsequently shackled and forced to sit on a cold concrete floor, and was discovered dead the next day from "hypothermia"). Another of the disclosed documents offers a timeline of Rahman's detention and includes the significant events that occurred during each month. See ECF No. 18-5 (Chronology of Significant Events). Plaintiffs are therefore not in the dark regarding the circumstances surrounding Rahman's death, even as they understandably continue to seek more information on that subject.

Finally, the propriety of the CIA's invocation of Exemption 1 has been confirmed by the Court's *in camera* review of the contested withholdings. It ordered this review both because of

the potential public interest in the sought information and the relatively low number of documents in dispute. See Physicians for Human Rights v. U.S. Dep't of Def., 675 F. Supp. 2d 149, 167 (D.D.C. 2009) (outlining factors that weigh in favor of *in camera* review). Its inspection has confirmed the accuracy of Shiner's declaration, and the Court is now satisfied that the Government has carried its burden of demonstrating that Exemption 1 applies. The review bolstered the conclusion that "the information withheld by the government 'is specific and particular . . . and would reveal far more about the CIA's interrogation process [and its cooperation with foreign partners] than the previously released records.'" Am. Civil Liberties Union, 628 F.3d at 621 (quoting Am. Civil Liberties Union v. Dep't of Def., 664 F. Supp. 2d 72, 77 (D.D.C. 2009)).

Ultimately, the reason Plaintiffs continue to press onward is precisely why they cannot prevail. They have access to the broad strokes of a grisly portrait of Rahman's death but seek the fine contours: more specific information as to the location of his remains and the process surrounding their disposal. Yet disclosing those details would officially acknowledge the specifics of an undisclosed CIA operation, the geographic position of a CIA facility, and the identities of any involved foreign partners. This Court simply cannot force the CIA to "disclos[e] to our adversaries the specific persons and areas in which CIA is interested," its foreign partners, and its "methods and resources." Int'l Counsel Bureau v. CIA, 774 F. Supp. 2d 262, 270 (D.D.C. 2011). Defendant has therefore carried its burden of establishing that Exemption 1 protects the relevant withholdings.

B. Exemption 3

Those fatigued by the Court's coverage of Exemption 1 will be comforted to learn that it can make swift work of the CIA's invocation of Exemption 3. The latter exemption covers

records "specifically exempted from disclosure by statute" provided that such statute either "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). In this case, the CIA asserts Exemption 3 in connection with documents it claims are protected by two statutes: the National Security Act of 1947, which requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure," 50 U.S.C. § 3024(i)(1), and the CIA Act, which provides that the Agency is exempted from provisions of "any other law" that require the publication or disclosure of "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507. Both statutes "may be used to withhold information under Exemption 3," DiBacco v. U.S. Dep't of Army, 926 F.3d 827, 834 (D.C. Cir. 2019), and Plaintiffs challenge only those withholdings for which the CIA relied on the NSA. See Pl. Opp. at 17.

Much of the above discussion regarding the deference granted to an agency in the national-security context remains relevant here, but Exemption 3, in fact, provides a lower hurdle for Defendant to surmount than does Exemption 1. "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." DiBacco, 795 F.3d at 197 (quoting Morley, 508 F.3d at 1126). "Although the invocation of other FOIA exemptions depends on 'the detailed factual contents of specified documents,' Exemption 3's applicability is thus more categorical." Cable News Network, 384 F. Supp. 3d at 30 (quoting Morley, 508 F.3d at 1126).

14

Unlike EO 13526 (relied on by Defendant in asserting Exemption 1), the NSA does not require the CIA to identify or describe the actual damage to national security that could be expected to result from the unauthorized disclosure of information covered by the statutes. See 50 U.S.C. § 3024(i)(1); Shiner Decl., ¶ 26. Courts, moreover, have interpreted the NSA's protection of "sources and methods" very broadly, holding that material is properly withheld if it "relates to intelligence sources and methods," Larson, 565 F.3d at 865 (emphasis added) (citation omitted), or "can reasonably be expected to lead to unauthorized disclosure of" such material. See Halperin, 629 F.2d at 147; see also CIA v. Sims, 471 U.S. 159, 168–69 (1985) ("The plain meaning of [the Act] . . . indicates that Congress vested in the [CIA] very broad authority to protect all sources of intelligence information from disclosure."); Elec. Privacy Info. Ctr. v. Office of Dir. of Nat'l Intelligence, 281 F. Supp. 3d 203, 213 (D.D.C. 2017) (describing NSA's protection of sources and methods as "near-blanket FOIA exemption").

In any event, most of the Government's withholdings for which it claims Exemption 3 overlap with its invocations of Exemption 1, and the Court therefore need not regurgitate the analysis supplied above. See Larson, 565 F.3d at 862 ("FOIA Exemptions 1 and 3 are independent; agencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other."). As to the rare redactions that the CIA justifies under only Exemption 3 (and only then via the NSA), the Court's *in camera* review has confirmed that Defendant has carried its minimal burden of showing that they are exempt from disclosure. This material, it bears mentioning, does not encompass any substantive information. Instead, it consists of labels, names of files, classified markings, and categories of restrictions on the handling of the material. Put differently, it is the sort of "internal organizational information" that Courts have found to fall within Exemption 3's

15

protective umbrella, see James Madison Project v. CIA., 607 F. Supp. 2d 109, 126 (D.D.C. 2009), and would, moreover, likely be of no consequence to Plaintiffs even if disclosed.

    C. Segregability

The Court last looks at segregability. FOIA requires that "[a]ny reasonably segregable portion of a record . . . be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The "focus of the FOIA" is thus on "information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." Mead Data Central, Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977). It naturally follows that "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Id.

The parties dedicate scant resources to debating the segregabiltiy issue. Defendant's declarant simply asserts that "the CIA conducted a document-by-document and line-by-line review and released all reasonably segregable, non-exempt information." Shiner Decl., ¶ 42. Plaintiffs devote most of their segregability-related arguments to the CIA's invocation of the now-irrelevant Exemption 5. Turning their focus to Exemptions 1 and 3, they merely posit that the CIA has made "unsubstantiated" claims that no additional information may be released. See Pl. Opp. at 21.

The Court concludes that there are no segregability issues in this case. The Government has released a fair bit of information about Rahman's captivity and death, and the Court's own line-by-line *in camera* review suffices to persuade it that the non-exempt portions of the withheld and redacted documents "are inextricably intertwined with exempt portions" and need not be further segregated. See Mead Data, 566 F.2d at 260. An agency is not obligated to segregate

non-exempt material if "the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value."  Neufeld v. IRS, 646 F.2d 661, 666 (D.C. Cir. 1981).  Even if the Court were to order the agency to disclose additional phrases, or even documents, it would take Plaintiffs no closer to their actual goal of discovering the whereabouts of Rahman's remains.  See also Mead Data, 566 F.2d at 261 n.55 ("[A] court may decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content.").  Unfortunately, there is no smoking gun in the CIA's withholdings that is generic enough to be harmless to national security and specific enough to satisfy Plaintiffs' desires.

## IV. Conclusion

For these reasons, the Court will grant Defendant's Motion for Summary Judgment.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  January 16, 2020

17